Boyd, Appellant, *v.* Boyd.

Argued April 10, 1961. Before ERVIN, WRIGHT, WOODSIDE, WATKINS, MONTGOMERY, and FLOOD, JJ. (RHODES, P. J., absent).

*Henry J. Albaugh,* with him *W. Walter Braham,* for appellant.

*James B. Ceris,* for appellee.

OPINION BY ERVIN, J., June 15, 1961:

Audrey Boyd, the plaintiff, has appealed from the order of the court below dismissing his complaint and amended complaint for a divorce a.v.m.

The original complaint averred indignities to the person but this was subsequently amended to include adultery. The master recommended a divorce on the ground of adultery. The court below found (1) that the defendant committed adultery but (2) refused the divorce because it found that the defense of recrimination had been properly established. We agree with the court below as to the first conclusion but disagree as to the second.

"It is our duty to examine the evidence de novo for the purpose of determining whether the charges alleged in the libel have been sustained. . . . While we are not concluded by the master's findings, his judgment upon the question of credibility is entitled to the fullest consideration; and this is especially true when his report, as in the case at bar, presents a searching analysis of the testimony." *Boyles v. Boyles,* 179 Pa. Superior Ct. 184, 186, 187, 116 A. 2d 248.

These parties were married March 12, 1945 and thereafter cohabited as husband and wife until April 19, 1957, with the exception of several periods when they were separated. There were no children of this marriage but each had a child at the time of their marriage. Plaintiff had been previously married to Jennie Hazel Clark, from whom he was divorced in 1943. At the time of the hearing plaintiff was 42 years of age and defendant was 37 years of age. Plaintiff worked

for Jones and Laughlin as a steel worker and defendant did housework for people by the day.

The master and the court below found that the defendant committed adultery with one Gene Taylor on two occasions in May 1957 and on one occasion on December 24, 1957. We have carefully read all of the testimony in this case and we agree with this finding.

John Hart, an unrelated and uninterested witness, testified that he saw Gene Taylor in the company of Calanthe Boyd very often at a house at 100 Glen Street in the Borough of Aliquippa between the months of January of 1957 and December of the same year; that upon the arrival of Mrs. Boyd and Taylor at this house they would be "pretty well stewed up"; that upon arriving at "Mattie's place" they would sit around for a few minutes, drink and then want to go to bed; that eventually the parties would go into his bedroom (Hart being a boarder) and that later on Gene would "holler out" and tell Mattie to throw him a towel. He testified that on one occasion, Christmas Eve 1957, he saw the parties in the bedroom, both of them in bed, and could see that Taylor had his "T" shirt on and he could see slip straps on Calanthe. The frequency of these occurrences was testified as being two or three times a month during the year 1957. Hart testified in great detail as to their conduct prior to their entering the bedroom and their conduct in requesting the towel while in the bedroom on two particular occasions in May of 1957. In addition to seeing them at 100 Glen Street, or "Mattie's place," the witness Hart also testified to seeing Calanthe Boyd and Eugene Taylor together at Mike Barr's tavern. Hart testified that the house at 100 Glen Street, known as "Mattie's place," was the scene of many drinking parties both with and without Gene Taylor and Calanthe Boyd; that the house would appear to have the reputation of a "good-time" house.

John Hart was subjected to a severe cross-examination but his testimony was not shaken. The master thoroughly examined John Hart's testimony and considered all of the arguments against accepting this testimony as true but concluded that he was a credible witness.

The master also gave thorough consideration to the denial of the defendant and the corespondent, Gene Taylor, as well as to their witnesses, and concluded the question of credibility against them. Gene Taylor testified that he never put his arms around Calanthe Boyd, never hugged her, and Calanthe Boyd testified that she never associated with Gene Taylor. From their testimony one would conclude that these two hardly knew each other. Yet when confronted with photographs which portrayed them with arms around each other they had to admit that the photographs were authentic. It would unduly prolong this opinion to repeat here the exhaustive consideration given to the subject of credibility by the master. Suffice it to say that it was a job well done and one with which we entirely agree.

In our judgment the defense of recrimination was not made out.

The defendant stated that the plaintiff lived with his first wife, Jennie Hazel Clark, for a period of one and one-half years in 1947 or 1948, during a three or four year period when the defendant had separated from the plaintiff. The defendant, however, after this alleged occurrence and after she had full knowledge of it, went back to live with her husband and continued to cohabit with him. This condoned the plaintiff's adultery, if any, with Jennie Hazel Clark. By §52 of the Act of May 2, 1929, P. L. 1237, 23 PS §52, it is provided: "In any action or suit for divorce for the cause of adultery, if the respondent shall allege and prove, or it shall appear in the evidence, that the libellant

has been guilty of the like crime, . . . it shall be a good defense and a perpetual bar against the same."

It has been expressly decided that a wife may condone the adultery of her husband so as to allow him to be divorced from her for the same offense committed by her subsequently to her condonation: *Talley v. Talley,* 215 Pa. 281, 64 A. 523.

The defendant also testified that she saw the plaintiff in a bedroom located in a property on Fifth Avenue, Aliquippa, with Louise Thornton at nighttime and without lights in the room. She stated that her husband was sitting in a chair smoking a cigarette and that he was fully dressed and that Louise Thornton was leaning across the bed and that she also was dressed. She also stated that her husband had lipstick on his collar. The husband's explanation was that he had borrowed money from the lady. The defendant asked her husband to leave and he did leave with her. It is hard to determine from the record just when this occurrence happened but it was certainly before the parties finally separated and the cohabitation thereafter condoned this offense, if we should assume that it amounted to adultery.

The defendant also stated that the husband of Goldie Jones complained to her about the plaintiff going with Mrs. Jones. If these acts took place, they undoubtedly occurred prior to the time when the parties were separated and the cohabitation between them thereafter condoned this offense.

Mattie Robinson testified that some time after the parties separated (the separation having taken place on April 19, 1957) she saw the plaintiff kiss and hug Theola Anderson after midnight in the Robinson kitchen. This was the only time that Mattie Robinson ever saw the plaintiff and Theola Anderson together privately. Mattie Robinson also testified that she never

heard plaintiff make any improper remarks or advances toward Theola Anderson or "proposition her."

The burden of proving the statutory defense of recrimination is on the defendant and requires proof of the same degree of certainty as is necessary to establish the existence of a charge of adultery against the defendant: *Brobst v. Brobst*, 171 Pa. Superior Ct. 499, 90 A. 2d 320.

We do not believe that the evidence was sufficient to convict the plaintiff of adultery with Theola Anderson. Plaintiff's conduct may have been indiscreet but it does not establish adultery: *Newman v. Newman*, 170 Pa. Superior Ct. 238, 85 A. 2d 613.

The defendant also presented evidence to show that the plaintiff, on January 13, 1958 (the parties having separated on April 19, 1957), borrowed $600.00 from a loan company and that the proceeds of the loan were used to buy furniture and household goods for one Kathryn Davis. There was also some testimony to the effect that plaintiff had stated an intention to marry Kathryn Davis. He was also seen in a public place having a drink with her prior to the date of final separation. This evidence, in our judgment, was not sufficient upon which to base a finding of adultery. Assuming that the plaintiff, after the separation and after his wife had committed adultery, planned to marry Kathryn Davis in the future, this would not constitute a defense to the adultery charge against his wife.

The order refusing the divorce is reversed and the record is remanded to the court below with direction to enter a decree of divorce a.v.m.

WRIGHT, J., would affirm on the opinion of President Judge MCCREARY for the court below.